Mr. Jefferson. May it please the court. Texas Disposal Systems has disputes with two insurers in this appeal. I plan to focus this morning on the dispute with Arch and would make three major points. First, we have cited evidence showing that Arch assumed an obligation to defend TDS on multiple occasions. Arch when the other policies had exhausted your problem with that. Your problem with that, Mr. Jefferson, is that there's no showing of consideration. Well, you're under the premium. I presume would be consideration that this was in the policy and TDS as well as Arch knew that the right to defend could be exercised by Arch and Mr. Jefferson. They would have paid a much higher premium if it was going to include an obligation to defend rather than a right to defend. You know, that piece of insurance is another cost. And so they paid for that on the three lower policies. But on that final one, they didn't pay for it. Your honor, that's that may be correct. But here, Arch assumed the obligation. So in the months preceding its repudiation of the defense, it assured TDS. It had conversations with FCCI and other insurers that it was going to assume when the primary coverage had exhausted. And in fact, that supports the finding of the United States Magistrate Judge who said it was implicit that they would assume the defense once the first three layers of insurance were exhausted. I think that correct finding shows why the court was wrong to grant Arch summary judgment. This is a material fact issue on a core issue. And then second, we believe that the court dismissed evidence predating January 10, the date that Arch purported to reject the defense that it already assured TDS it would give on the ground that even if it elected to defend, Arch could not be held to that promise. But we have shown that a promise, even one condition on a The elections in Arch's policy included not only the right to defend, but also the right to investigate and to settle. And we know that Arch exercised that right to settle before January 10, which was also conditioned on exhaustion of the underlying primary policies. So just as Arch's election to settle pre-existed exhaustion, so did Arch's agreement to defend. And then third, I think this is important, Judge, the policy. If we look at the policy itself, because it does contain this idea of a right, the Arch policy, and not its assertion that it could always change its mind, determined whether Arch could withdraw the defense. The policy conditions withdraw on Arch's exhaustion of its policy limits, not on a change of heart, as they say in their briefs. That policy you will see in the record at page 1767 through 68. So Arch still had millions left on its policy limits on January 10th, which is why TDS insisted that Arch honor its obligation. Well, and that's why it might have made sense for them to do that, because they might have preferred to hire their own counsel and deal with that to avoid costing a lot, but that doesn't make them have to. Again, it's a right. I have the right to do X, but that didn't mean I have to do X. Your Honor, but what if Arch itself tells TDS before the trial and even before the major settlement that we are defending you when policy limits are exhausted? And that's what the evidence... I mean, in other words, if they had agreed, they'd reached some deal and TDS had paid extra or done something extra, but TDS didn't do anything different that benefited Arch. So how is that a modification to the contract? I mean, that's essentially what you're arguing for is a modification to contract that requires an agreement and consideration. And I don't see that the original premium, which did not pay for defense, is that consideration. Your Honor, the original agreement said that we shall have the right, but not the duty to investigate and settle any claim or assume the defense of any suit, which in our opinion may give rise to payment. So there is the right. Okay, so they have that right, but they may not withdraw that right if they exercise it, unless we may with the rest of the policy says we may however withdraw from the defense of any suit or tender the continued defense to you if our applicable limits of insurance are exhausted by payment. So in other words, here you have a right that they exercise contemporaneously with the ongoing litigation here. In fact, Julie Tucker said until underlying limits have been paid, Arch does not have an obligation to pay for defense. We remain very much involved and on board with the defense of this claim. And then she said, I've had several communications with underlying defense counsel and have communicated with them that it is my understanding and I'm quoting here from an internal claims memorandum from Julie Tucker that Arch's defense obligation commences once all underlying limits have been paid out. And then she wrote to David Merkley, who is defending Texas Disposal Systems, and asked him to provide a defense budget through trial to enable her to prepare to take over defense costs when that obligation kicks in for Arch. So what I'm saying is if we're reading the policy, Texas Disposal Systems, we know under the policy that they have the right but not the duty to defend and that they now. So she says they have the obligation that's misstating the policy and the policy is very clear. So it isn't something where we're all confused about what does this ambiguous word mean? I think what I believe that what she's doing is stating an election that she has the right under the policy that Arch has the right. She's Arch's corporate counsel, corporate representative here. She is representing Arch and she is telling TDS that not only do we have the right but we're exercising that right to defend once the underlying limits are exhausted. What is your best case for the proposition that saying, let's say they said we plan to take over the defense, which I don't really think they said that, but let's say they did, but prior to the other insurers ending their defense, which was January 15, as I understand it, they say not going to do it. Any case it says tough, you have to still come in and pay for the defense. Your Honor, we've cited a series of cases, not in this insurance context, but where you can have future obligations and that if you exercise them, then you can be bound by them. And so we have that. We also have Menchaca. We don't have an insurance case on that. Not on this point, Your Honor. We've looked, but we have not. Is that something we should certify to the Texas Supreme Court? We'd be happy with a certification to the court on this question of state law, certainly. But I think what the state, the Supreme Court would say, it would be like a tort case. Once you voluntarily undertake a duty, then you can be responsible for breach of that duty. In a negligence case or in a contractual case, I think that's true. And I think here... Negligence case is different. I don't have to, if you're drowning in the ocean, I don't have to save you, but if I start to save you and I mess up, then you can sue me. But I don't think that's a breach of contract. That's a negligence case. And I didn't have to try to save you, but having done so, then I have to do so with reasonable care and all of that. It's not a direct analogy, but I think here, the policy says we have the right to defend. And then they exercise that right. And then the policy says the only way you can withdraw from the exercise of that right that you've already taken on is if your own policy limits have been exhausted. And we know that that is not true here. But we have more facts, I think, Judge, that support what I'm saying. And that is that the Arch actually hired Thompson Coe. There's a lawyer named Will Moyet who represented TDS in mediation, attended trial, even helped... Why isn't that in associating as the other... There's a section that says they can associate. Why isn't that in associating? Because he never was primary counsel. He was never first chair or whatever. He was helping and that's nice, but I don't see how he was ever the actual attorney for them as opposed to just a second chair or whatever you want to call him. Well, that also gets into our errata argument, Judge. The vice president for casualty, Christine, I'm forgetting blanking on her last name right now, and testimony... And I'm accepting that. I'm saying either way, okay, even if you accept the original answer to the deposition, he's still a second chair and didn't he continue to be a second chair in the case? Yes. In fact, Arch budgeted $100,000, I think, for him to continue defending TDS. Okay, so his representation as a second chair never changed. And so I don't see how that helps you make them have to pay for the first chair, Merkley, who's at a different firm, different lawyer altogether. Yes, the point I'm making there is, to the question, did Arch agree to defend? There were two lawyers that were sitting at that table to defend TDS. One was first chair, David Merkley. If you accept the pre-errata statement and the evidence about his participation, Will Moyes, then it wasn't just advising Arch about coverage or anything else. It was actually to help defend. So you had two lawyers defending TDS. They exercised the right. We all know a second chair is a really different lawyer than a first chair. The second chair can't, you know, when I was the associate, I couldn't tell the partner what to do. I could make good recommendations. I could, you know, write notes. I could pull on the jacket, but I wasn't able to tell him or her what to do. So, I mean, that's just a different person and that is what he was doing at the time, right? I think he was there to defend TDS. And I think that goes to our argument that Arch exercised its right early on to defend TDS. But it did not have the right to first chair until the other three were gone because they're the ones who get to control and that's actually fairly important. Controlling the, you know, progress of the case and the decisions that you make. There's all kinds, you know, well, litigation isn't just ABCD. There's a lot of decisions to be made. Yes, and so the first chair is the one who does that via the the person who's directing that. And while TDS is the client when the insurance company is in charge, they are directing that. I think you're exactly right. And what we're saying though, and this is any evidence as well, that David Merkley knew that that decision, who would be first chair, was not his to make and was not TDS's. It was Arch's and he in fact even offered to defer to himself be second chair. So he wrote Julie Tucker and said, who do you want to be lead counsel here? Me or Will Moyet, who you've hired to defend TDS. So we knew at that point that that determination was Arch's because Arch had undertaken the defense of the claim and that was the status when it withdrew its defense. And here Arch anticipated, I think everyone knew that the primary limits would be exhausted. So when they're making these statements about we will take over when the limits are exhausted, they are invoking that part of the policy that gives them the right to take over the defense, which is in fact what we say they did. A quick question about FCCI. You said it was December 27 through February something that they should pay, but it seems like the other two insurers in between FCCI and Arch were responsible until January 15. So why would, even if we ended up agreeing with you, why would FCCI owe for those three weeks? I think that would be a matter that we would determine to the extent that the defense costs were covered by the other insurers during that time period, then FCCI would not owe, you know, when those defense obligations were made. But there is a period in that time in which TDS was not being, its defense costs were not being covered by anyone. And we say that FCCI was obligated to make that payment up until the time there's final settlement. And on FCCI, how do you explain the language on or before within 30 days, meaning that they have to wait until both courts approve the settlement? Because on or before control? The language of the settlement agreement itself incorporates the settlements which require court approval. I think it all has to be packaged together. And here, the check that FCCI sent, it was sent to the Escamilla Law Firm, to Leah Bullock individually, and as representatives of the estate and of the minor children. So you had a global settlement that didn't finalize until the last Wharton County probate court judge approved it. So where in the record does it say that the courts have to before you pay it? It said the settlement will not be effective until one, court approvals are obtained, and two, all releases are executed. Where is that record site you're reading? I will, Your Honor, I will give that to you on rebuttal. I'll give you the exact date of where that is. And so I see my time is expired and I will reserve the remainder for rebuttal. Yes. Yes, you saved time for rebuttal. Thank you. Thank you, Judge. Ms. Brasley? Yes, may it please the court, I'm here today representing FCCI Insurance Company, who was the primary insurer who did defend until they tendered their limits. The sole issue as to FCCI is whether that tender of their remaining limits exhausted their duty to defend. In their brief, TDS has raised arguments that that was not a payment and that it was not a settlement. As to a payment, as Mr. Jefferson just referenced, it was a check made payable to the plaintiff, Leah Bollock, in all of her capacities and to her counsel. And it was made after a mediated settlement agreement that included the FCCI limits. So there should be little doubt that that was a payment. As to whether it was a settlement, again, it was made after a mediated settlement agreement for a lump sum of $14.75 million, far in excess of FCCI's limits, that exhausted three layers of insurance. Ms. Bollock signed that agreement in her three capacities individually, as next friend for her two surviving children, and as representative of the estate of her deceased child. And that's why the check was made payable to all three. The settlement, of course, proceeded in pieces because of the different hats that Ms. Bollock wore. Each of these pieces, however, was part of an integral part of the overall settlement contemplated by that mediated agreement. It was also exhausted by layers. So it makes sense that FCCI's payment would come first, that LIU's and Rockhill's payments would come next, and that the last part would fall into Arches' layer, because that was the way that the tower was set up. TDS acknowledges in their brief that FCCI defended until a portion of the claims settled. Nevertheless, it claims that the payment was premature. On page six of our brief, we've laid out a chronology of most of the events. There is an unfortunate typo as to the year of our payment. It was 2017. That's reflected on the check, which is on our record excerpts tab one. Do you know whether the intermediate insurers paid the December 27 to January 15 period or not? Yes. Rockhill, who was the first layer excess, paid the defense cost between December 27 and January 15, which is when their payment was tendered. So if we ended up agreeing with Mr. Jefferson on how FCCI should have functioned, then that would mean, well, you would only owe the January 15 until the February, I think it was 14, was when the probate court approved. Right. Okay. And I guess I'm wondering why isn't that within 30 days? January 15 to February 14, isn't that within 30 days? Well, 30 days of what, your honor? Right. I mean, the mediation agreement says on or before within 30 days up, and then it lists all this stuff. And so that was the final event, and that was within 30 days of that. Well, yes, actually, we were well within 30 days of that because we were within 30 days of the first portion of the settlement concluding. But yes, certainly we made our payment on or before 30 days after the mediated settlement agreement. Now, TDS's argument is we had to wait until all the pieces fell into place and then make our agreement, but I've never seen a case that says an insurance company can pay too early. Well, yeah, it could. But here, I guess I'm wondering what would have happened if either of the, what would have happened if the probate court had not approved the settlement? Y'all had already paid the million that would go to the other settlement pieces. Would that, the rest of the settlement still have gone forward or would that have vacated the entire settlement? And there's some speculation there as to what would have happened, but in the court's recent opinion in the American Guarantee versus Ace case, they talked about that in the Stowers situation as to an ad litem, and they said it was a lump sum settlement and the fact that there was an ad litem required did not make it a conditional settlement because really it was just a matter of apportionment. If the court didn't approve it, then there just have to be a reallocation. And I think that that's what would have happened here because Ms. Bullock was- Wasn't that a Stowers case? Yes, it was. Okay, and that's not our case here, obviously. It's not our case. Our case is more like a Greco, but they did talk about does it make it conditional. Her settlement agreement that she signed on January 12th on behalf of the estate doesn't say anything about court approval or any condition. She just says she will get court approval. Realistically, what I think would have happened if the probate court had said, no, 30,000 is not enough, is that she would have had to reallocate some of the money from her individual settlement to the estate settlement. And she'd signed that settlement also on January 12th for excess of $10 million. So I think that the lump sum settlement of the mediated settlement agreement to which she agreed in all capacities would have stayed in place. It just would have been a question of, you know, the allocation of the money is divided. And of course, the money to the estate was for survivor benefits. The brief time, the very sad and a very tragic case, but the brief time that the 12-year-old maybe realized that the accident was happening. Yes. Tragic case and no one disputes that. Absolutely, positively. And, you know, unusual with the way it was lined up between the mother and the father and the different interests involved too. So in the chronology, what's important, I think, is that, you know, the mediation was November 28th. Our check was issued 30 days after mediation on December 27th. But the settlement with the minors was approved on December 21st, 2017. And that settlement had three components. There was an executed settlement agreement. There was an approval by the court with the end items for which FCCI paid, and there was a judgment entered. So if our policy says that we have to exhaust by payment of judgments or settlements, as of the 21st, there is a settlement and a judgment that is in excess of our limits. And TDS says, well, how do we know that our million dollars went to that judgment and settlement and not the other parts? Well, we're the primary. And the basic law is the primary exhaust. And in the Agrecco case... And that you don't have to settle every single case to be able to exhaust your policy. That's well established. I remember when that line of cases came out. That's true. That would be Arnold and then Soriano, and then in the Fifth Circuit, the Sitko case. So yes, we could have settled any part of this. Now, as it turned out, it was part of this lump sum, piecemeal settlement of an overall plan. And that's what we settled. But yes, as of the 21st, there was both a settlement and a judgment that was in excess of our limits because the cash portion alone was almost two million dollars. And then there was also an annuity. And that's when the... After we contributed our check, that's when the next layers began defending or began paying the defense cost because they assumed that we had exhausted as did we. But until you all paid December 27, you all were controlling the defense, right? Not ours. Right. Right. You know, realistically, and I think there's some notes in the record about this, there's communication among all the carriers because on about day one, we knew that our limits would be exhausted somewhere along the way. Yeah.  there was always an anticipation that we would be exhausted. that there would be exhaustion and they would be implicated. We just didn't know what point in time that would happen. So we have that settlement and I referred to Agreco and I think that that's an important case. Again, it's not exactly our case, but in the Agreco case, the court looked at the settlement by the primary, which did not settle all the claims. It was a partial settlement and then a covenant not to execute except against insurance proceeds. But the court talked in great detail about what is the settlement under Texas law and is it the conclusion of a disputed claim and is there a mutual concession in order to avoid resolving controversy? But we had that. We offered our limits. We paid our limits as a portion of the settlement. It did resolve a disputed claim. It resolved the claims of the minors. They also talk about the Kings Park case, which was related to the Judwin case. And in the Kings Park case, they talk about the benefits from a covenant not to execute. And again, we paid actual cash for release, but the covenant not to execute. They said had benefits because one, it triggered the excess as did our payment. Two, it was an essential step toward a full release and three, it was an integral piece of the overall settlement plan and we would submit that our payment was exactly the same. There was no way we could satisfy a 14 million dollar settlement. We can only pay a piece of it. We paid that piece. It went towards the first settlement because we're the first insurer on deck. So as of the 21st of December, when there was a settlement, a release, a judgment on the minor claims, our policy was exhausted and therefore requests that the court affirm the district court's opinion. Thank you, Ms. Bradley. Mr. Dove. May it please the court. I'm Chris Dove speaking on behalf of Ark Specialty Insurance Company and because this court has already discussed the fact that this is not a duty to defend case, I would like to begin by focusing on two key concepts that arise from the fact that this is a right to defend case. First, the fact that Arch had no right to assume this defense until the underlying layers were exhausted. The policy could have been written differently, I guess, theoretically, but Texas law keeps layers separate for a reason. As it's explained, we don't want different insurance companies throwing elbows to try to control the defense. It's very clear who has the defense at a given time. In this case, Arch could not exercise its right to defend until all of the underlying layers had been exhausted. And second, to assume the defense is an action. It's not an idea. And Justice Jefferson this morning has been using the rhetoric of action, which I think is appropriate, as opposed to their brief, which sometimes talked in terms of vague, intense, or inchoate purposes or whatever. That would not suffice because what the policy requires is that you assume the defense. You take your hands. How do you explain? Let's assume, arguendo, we decide that the deposition couldn't have been changed and so that Moye was representing TDS. How do you then explain that? Because of the undisputed facts about what Will Moy actually did, and this is an area where I would like to take what you said in your colloquy with Justice Jefferson earlier and clarify it a little bit. I agree with you that it would not matter one bit if he was second chair, but that is not in the record. What the record shows that he did is that he helped behind the scenes, talked with the other lawyers, was of use, and then watched the trial. It does not show that he sat at counsel table. It does not show that he ever gave any instructions. He never spoke on behalf of TDS. He never filed a document on behalf of TDS. This is undisputed. There is only one piece of evidence that TDS likes to take out of context and imply that it means something different. What it was was that their attorney said that at the mediation I assumed that in the future Moye would be the second chair at trial. But that never happened. That's not what actually unfolded what he did. His actions never assumed the defense. If he was the second chair, your argument is what? So long as we maintain all of the same facts, if he's sitting at counsel table, because I don't, as you had said, what does second chair really mean? If he's sitting at counsel table, but all the facts remain the same, he never speaks on behalf of TDS. He never files a document on behalf of TDS. He never gives any instruction to anyone about how they should conduct the case, all of which is undisputed. If we keep all of that the same, it does not matter if he's sitting at counsel table. It does not matter if he says I'm second chair. So long as he continues to reiterate, I am not in charge. I am not assuming the defense. I'm not telling anybody what to do. So long as that stays the same. Nobody has assumed the defense and there's no evidence here that he did. Another piece that TDS likes to talk about as being an evidence that we actually did take this action of assuming the defense was the action where we were in control of the second mediation in the case. We've talked about how this isn't inconsistent with the language and the policy at all because we did this under a Stowers obligation. And this is an area where TDS is as misspoken in its reply brief and I want to make sure you have the right record citation. They claim the Stowers duty could not have arisen because there was not a settlement offer that was within the tower of insurance coverage. The details are part of the sealed record. And so I'm hesitant to get specific about numbers here in open court. However, at 1425 to 26 of the record, this is part of Russell Parrish's deposition on behalf of TD TDS where he explains that there was a settlement offer from the bullet plaintiffs that came within the tower of coverage. The Stowers duty existed at this point Arch given the way that the common law works has no choice but to take very seriously this settlement offer because all of the other layers of insurance have tendered their full limits. They naturally have to be in charge of that settlement discussion. But as your honor also knows Texas draws a very strict distinction between the duty to defend and the Stowers duty, which is part of the duty to settle in good faith out of an indemnity obligation. These are separate and concepts. Once you understand what the record says that we had a Stowers duty. We didn't behave inconsistently. We're not talking out of both sides of our mouth, which is what they're alleging. Let me ask you about Miss Tucker. We haven't talked directly about the whole issue of her deposition, but I'm just struggling to figure out how it is at all proper to say that TDS should have gone out and subpoenaed a woman who was in the middle of cancer treatment. I would say this it is a difficult position for everybody involved. TDS wanted to take her deposition. What could Arch do but what it did it said she's not our employee. We cannot compel her. We have no power over her. We voluntarily contacted her. We didn't have to do that. Even we could have just said she's not our employee. We're done. We voluntarily contacted her and came back and said she had told us she's not willing to testify voluntarily because she's undergoing cancer treatment at this point. This is a difficult situation, but Arch didn't make it that way fate made it that way by unfortunately having this Tucker can we approve of the magistrate judge's determination that nonetheless you should go subpoena. That's not really consistent with the or the District of Texas Donde case or with the general rules that you should be respectful of the fact that people can't a witness might be sick and unable to appear and then you're forcing you're dragging someone out of the chemotherapy chamber and putting them in a chair to depose them. How is that something we should approve? Because of two features that I think make this a very different case first as soon as Arch recognized that it had this problem it immediately offered her supervisor for deposition. She gave her deposition addressed all of the issues that Miss Tucker would have addressed. So that's one of the mitigating factors that I think changes it and the second is the fact that TDS waited so long and made such a vague and open-ended request if they had immediately gone to the court. Once they received this and said we have months to go before the deadline. However, we've got an awkward situation. She doesn't want to talk. What should we do? That might be a different situation. But what we have here is this court giving deferential abuse of discretion review to the statement. If you wait until the very Eve knowing for months that you have this problem and then say very vaguely, please lift this and I'm not going to tell you when I'm going to take the poster. I'm not going to tell you how I'm going to depose her. I'm not going to tell you how much time I need for trial to start. I just please lift this deadline and let this continue on vaguely on the docket. It's not irrational or unreasonable or arbitrary or capricious for the magistrate judge at that point to say given what you knew the fact that you're bringing this up now is entirely inappropriate. I feel bad for the fact that TDS wanted this deposition, but certainly everybody handled it as well as they could given the circumstances and I really would hate for this court to think that what we're doing is in any way being rude to Miss Tucker or trying to exploit her a very unfortunate condition. Another point that I would like to address and I think it's necessary Justice Jefferson says well part of the problem they've got is that once they exercise this right they can't withdraw until they've exhausted and the problem with this is that he would be right if we clearly exercise the right which is an action not a hope not a wish not a dream and action after that right came into existence if on the 15th or after there were any evidence that we said we assume the defense at that point is exactly right. We cannot relinquish that defense until we have exhausted our policy, but what the evidence shows instead is that that right did not exist. There are statements that are made in which as we pointed out in our brief every time our says this right does not currently exist. We are not driving the bus. We cannot drive the bus until a future date and then says something about what may or may not happen on a future date. Justice Jefferson has talked about how this is somehow implying but I think we're talking about two different reasonable uses of the word implying. I don't read the magistrate is saying when you said this you were implying that you already had made an irrevocable decision. Mr. Douglas, your time has expired now. Thank you. Thank you, Mr. Jefferson. You say time for a vote. Thank you, your Honor. Judge Haynes just to give you that record site. The settlement agreement is at 1626. It is also a record excerpt at page 8 and it says the settlement agreement says the sum will be paid within 30 days of drafting instructions tax IDs court approval and an executed releases and that that that goes to our argument for FCCI on the harm to TDS. If we're correct and I understand this is the issue, but if we are correct that arch exercise, it's right and assume the defense then TDS the the the consequence of that would be that TDS would not have to pay for the defense for the rest of the case and we knew because of the tragic circumstance and also because of the lawyer involved in the case against Gardner that the defense obligations were going to be very significant. Tony Busby was the lawyer for the plaintiff in that case. And I think the experience is published about what what that means in terms of litigation. Mr. Dove started with saying that the the way that these negotiations work among insurers and excess is to avoid the throwing of elbows and I agree with that and I would say that this is what happened here that there is communication among TDS among the primary insurers with the excess insurers leading up to the trial in which everyone agreed that when the limits were exhausted of the primary carriers and everybody believed they would be then arch would take over the defense that put us at ease that put everything in the record that disputes. Mr. Dove's statement about how he pronounces it. Moy how Moy actually acted really more of a back chair than a second chair, but certainly never a first chair. Yes. I think I agree with him that there's no evidence that he was at counsel table during the trial, but the evidence was that he participated meaningfully and the for the most clear example is in drafting and revising David Merkley's closing argument on behalf of that associated with as opposed to assuming the defense. If you hire a second chair or back chair, whatever we're going to call it a non first chair because I think you can hire three lawyers five lawyers to defend you in a case the end. So yes, there's going to be a first chair, but it's just like hiring appellate counsel. You know, I'm not going to argue at counsel table. I'm not going to cross-examine a witness, but I would be there to defend just as the primary counsel was. So if it is true that that without the errata, but there's also other evidence that arch hired Moy to defend TDS, then they exercise their right to defend and an early point in litigation and I don't think they can why isn't that associating because at the point they hired him they did not have a right to defend even if they wanted it because the other insurers were still involved. Yes. So why did that why isn't that just associating as opposed to the first chair defense? I think it's for this reason because they control at that point. They control the defense and that is why David Merkley tendered the case over to Mr. Moy and said arch if you want him to be lead counsel, I will step back and arch said no. Mr. Merkley. We want you to continue to lead counsel. Also. They said we want Mr. Stranlow who represented the driver to continue as counsel for the driver that is controlling the defense that is they're taking on that. I thought that was before January 10th. All of that was before January 10th. Yes, that's correct. And I'll just conclude your honor with this. This was as you say a tragic a very tragic event with huge liability concerns. And that's why early in the case in these communications TDS is saying will you undertake the defense and Julie Tucker is saying yes, we will once the obligation once that our defense obligation obligation. She says this that the record 1870 our defense obligation commences once all underlying limits have been paid out that is as clear as it can be and that's something that we are entitled to rely on. She says to David Merkley and they please provide a defense budget to me. She's asking the lead counsel for provide a defense budget so that she can take over defense costs when that obligation kicks in for March March your honor Judge Smith. I see that my time has also expired. We would ask the court to reverse the summary judgment and remand for trial against both insurers. Thank you. Mr. Jefferson your case is under submission and court is in recess.